UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KEITH EMMANUEL; RICHARD HOMCHICK; and CHARLES PETERS, as individuals, | Case No. 2:18-cv-00377 |
| Plaintiffs, | *CORRECTED* COMPLAINT |
| v. | |
| KING COUNTY, a municipal corporation and responsible entity of the KING COUNTY SHERIFF'S OFFICE and the KING COUNTY PROSECUTING ATTORNEY'S OFFICE; CITY OF BELLEVUE, a municipal corporation and responsible entity of the BELLEVUE POLICE DEPARTMENT; JOHN URQUHART, individually and in his official capacity as King County Sheriff; DANIEL SATTERBERG, individually and in his official capacity as King County Prosecutor; STEVEN MYLETT, individually and in his official capacity as Bellevue Police Chief; and JOHN DOES 1-10. | |
| Defendants. | |

Plaintiffs KEITH EMMANUEL, RICHARD HOMCHICK, and CHARLES PETERS (collectively "Plaintiffs"), through their undersigned counsel, allege as follows:

COMPLAINT – Page 1

## I.  NATURE OF THIS ACTION

1.      This lawsuit seeks to stop the King County Prosecuting Attorney's Office, King County Sheriff's Office, and the Bellevue Police Department from maliciously and indiscriminately attributing to Plaintiffs criminal activity concerning human trafficking and sex slavery that Plaintiffs did not perform, have not been credibly alleged to have performed, and with which they were not charged.  Plaintiffs were charged with promoting prostitution in the second degree for "advanc[ing] prostitution" under RCW 9A.88.080(1)(b), namely for writing reviews and sharing experiences on a private online message board. Yet, Defendants have deliberately conflated that prostitution charge with human trafficking and sex slavery as part of a concerted plan to secure private funding and manipulate media coverage.

2.      In peddling the false narratives, King County, in particular, has acted with apparent conflicted interests and undue external influences, seeking out private monies, with strings attached, to cover budget shortfalls.  King County has received hundreds of thousands of dollars from an out-of-state group called Demand Abolition that is conditioned on King County increasing the number of arrests of so-called "Johns" by a certain threshold and generating publicity related to those arrests.  Demand Abolition has funded, in part, the salary of Senior Deputy Prosecutor Valiant Richey and paid for media consultants to work arm-in-arm with Mr. Richey and other King County agents to associate alleged "Johns," including Plaintiffs, with human trafficking and sex slavery.  In so doing, Defendants have placed personal and private third-party interests over Plaintiffs' rights.

3.      To be clear, this case does not seek to litigate the actual criminal charge, however unprecedented, or to prompt a moral debate over the alleged conduct underlying the charged offense. Rather, this lawsuit seeks to enjoin and seek damages for Defendants' ongoing efforts to vilify and humiliate Plaintiffs and to characterize their arrests as something that they are not.

COMPLAINT – Page 2

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

## II.  PARTIES

4.      At all material times hereto, plaintiff Keith Emmanuel was a resident of King County, Washington.

5.      At all material times hereto, plaintiff Richard Homchick was a resident of Thurston County, Washington.

6.      At all material times hereto, plaintiff Charles Peters was a resident of Washington County, Oregon.

7.      At all material times hereto, defendant King County is a Washington municipal corporation and the responsible entity for the conduct of the King County Prosecuting Attorney's Office ("Prosecutor's Office") and King County Sheriff's Office ("Sheriff's Office"), and agents thereof.

8.      At all material times hereto, defendant City of Bellevue is a municipal corporation and a political subdivision of the State of Washington and responsible for the conduct of the Bellevue Police Department ("Bellevue Police"), and agents thereof.

9.      At all material times hereto, defendant John Urquhart was the King County Sheriff, acting as an agent of the Sheriff's Office.

10.     At all material times hereto, defendant Daniel Satterberg was the King County Prosecutor, acting as an agent of the Prosecutor's Office.

11.     At all material times hereto, defendant Steven Mylett was the Bellevue Police Chief, acting as an agent of the Bellevue Police Department.

## III.  JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     This Court has supplemental jurisdiction over the state claims arising out of the same incidents pursuant to 28 U.S.C. § 1367.

COMPLAINT – Page 3

14.     This Court is the proper venue under 28 U.S.C. § 1391 as one or more of the defendants reside in this judicial district and this case arose within this judicial district.

15.     On January 5, 2018, Plaintiffs filed notices of claim with King County and the City of Bellevue for the damages alleged herein. More than sixty days have elapsed since the filing without resolution of the claims.  The notice of claim provision under RCW 4.96.020 has thus been satisfied.

## IV.   FACTUAL ALLEGATIONS

16.     This action seeks redress for King County and the City of Bellevue's false and malicious public campaign against Plaintiffs, wrongly imputing that Plaintiffs were engaged in human trafficking, sex slavery, and other crimes.  The publicity campaign arose out of a financial arrangement between King County and a special interest group called Demand Abolition.  By virtue of that partnership, King County, in particular, has misused the criminal justice process for ulterior purposes and betrayed principles of fundamental fairness.

### A.  King County's Undue Influences—Receipt of Outside Monies with Strings Attached from a Special Interest Group During a Budget Crisis

i.   Budget Shortfalls Afflict King County

17.     Budget shortfalls have plagued King County and, particularly, the Prosecutor's Office for years.  On October 5, 2016, Prosecutor Dan Satterberg explained to the Budget and Fiscal Management Committee of the King County Council that, in the last nine years, the Prosecutor's Office has lost 60 of its full-time employee positions, and the office is taking on forty percent (40%) fewer cases and a forty-five percent (45%) longer time to process them due to insufficient funding and shortage of deputy prosecutors.  Mr. Satterberg described the budgetary constraints as follows:

COMPLAINT – Page 4

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

> There is a saying that necessity is the mother of invention and it did require us to be creative and we did a lot of that through diversion and prosecutorial discretion, but there is a limit to that.  At a certain point *necessity just makes you needy*, and that is where we are now.

Mr. Satterberg noted that, due to this budget crisis, his office now only prosecutes "solid, serious, public safety matters."

### ii.   King County Partners with Demand Abolition

18.     To meet its needs, the Prosecutor's Office sought alternative sources of funds. It applied for government grants and, when that was seemingly not enough, sought out an opportunity for private funding from a special interest group called Demand Abolition.

19.     Based out of Cambridge, Massachusetts, Demand Abolition seeks to, according to its website, address the "glaring problem" of "sex trafficking" and to "eradicate[e] the illegal commercial sex industry in the U.S. . . . by combating the demand for purchased sex."  Senior Deputy Prosecutor Val Richey found Demand Abolition in or around 2013, at a time when Demand Abolition was looking, in turn, for a law enforcement partner to initiate a pilot program aimed at reducing demand.

20.     In January 2014, the Prosecutor's Office applied for the Demand Abolition grant.  In the application, Mr. Richey identified, among other things, the following strategies to reduce demand: (i) Increase the number of arrests and prosecutions of buyers across King County; (ii) Increase publicity on arrests, prosecutions and penalties in King County through traditional media to create a credible and demonstrated threat of arrest and prosecution; and (iii) Incorporate into criminal justice responses additional deterrents such as car impound, increased monetary fines, community service and sex offender registry to increase effectiveness of sentences.

21.     In addition, the Prosecutor's Office committed in its application to "[r]educing demand by 20% in 24 months" and to "increase the number of arrests [of buyers] by 50%."

COMPLAINT – Page 5

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

22.     In or about April 2014, Demand Abolition awarded the first of recurring annual grants to the Prosecutor's Office, initially providing $50,000 for one year to be distributed and used in accordance with certain terms and conditions.   A separate entity called the Hunt Alternatives Fund ("Foundation") provided the actual funds under the grant.

23.     The contract between the Prosecutor's Office and Demand Abolition provided that the Prosecutor's Office could only use the funds for specific demand-reduction efforts— *i.e.*, toward "reduc[ing] demand at a local level by 20 percent in two years"—and that the funds would be distributed in installments subject to receipt of "satisfactory quarterly updates and results," which included, among other things, "[l]ogic models outlining expected quarterly inputs, activities, outputs, outcomes, and, if relevant, planned budget expenditure."

24.     The terms also required that Mr. Richey, as a "core team" member, would maintain regular contact with other team members, including from Demand Abolition, on a recommended weekly basis.   The terms further required the Prosecutor's Office to make available to Demand Abolition "all files, records, accounts, personnel and clients or other beneficiaries for the purpose of making such financial audits, verifications or program evaluations as the Foundation deems necessary or appropriate concerning this grant award."

25.     Notably, the contract also had a claw-back provision: The Foundation could require from the Prosecutor's Office "a total or partial refund of any grant funds if, in the Foundation's sole discretion, such action is necessary."

26.     Upon information, Demand Abolition has continued to renew the contract with the Prosecutor's Office each year since 2014.   Each time, the conditions largely remain the same as those in the original grant, and, if anything, include more specific performance metrics for the Prosecutor's Office.   For example, in February 2016, shortly after the below-referenced arrests, Demand Abolition awarded a so-called "CEASE" grant, under which the Prosecutor's Office was "expected to attempt to achieve a total of 14,800 direct buyer disruptions by January 31, 2017, including at least 1,100 high frequency buyers."

COMPLAINT – Page 6

iii.  The Publicity Component of the Grants and Paid-For Media Consultants

27.     As noted, the Prosecutor's Office committed to "increase publicity" around the arrests of "Johns" as part of the original grant application.  To that end, Demand Abolition supplied political and media consultants to King County agents, including Mr. Richey, to provide them with various media platforms to publicize their demand reduction efforts and help with messaging in connection with the increased arrests of "Johns."

28.     The privately funded media consultants who worked with Mr. Richey, among others, advised the use of language in press conferences and in press releases and other materials that broadly conflates promoting prostitution in the second degree—which does not entail force, fraud or coercion—with crimes of human trafficking—which necessarily entails force, fraud or coercion.

29.     The Prosecutor's Office, with the other defendants marching lock-step, routinely adopted the language provided by these media consultants, knowing and/or recklessly disregarding that the resulting message would be highly misleading, and would improperly impute crimes to the subjects of those press releases (such as Plaintiffs) who had neither committed nor been charged with committing those crimes.

**B. Plaintiffs' Arrests and "Unprecedented" Charges of Promoting Prostitution**

30.     On or about January 5, 2016, the Sheriff's Office and Bellevue Police arrested a group of about ten "Johns" after a months-long undercover operation dubbed "Operation No Impunity."  Plaintiffs were among those arrested.

31.     Based on the charging papers, the Prosecutor's Office charged Plaintiffs with promoting prostitution in the second degree under RCW 9A.88.080(1)(b).

32.     The criminal complaint did not allege that Plaintiffs financially profited from their alleged activities.  Nor did the complaint allege that Plaintiffs were engaged in any crime involving force, fraud, and coercion.  Rather, the Prosecutor's Office alleged that Plaintiffs "knowingly advance[d] the prostitution of one or more unidentified individuals" by posting

COMPLAINT – Page 7

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

reviews on a website(s) and hosting meetings where they shared their experiences within a select group. According to the press release announcing the arrests, the felony charge of promoting prostitution for the conduct at issue was "unprecedented."

### C. The January 7, 2016 Press Conference and the False Statements of Human Trafficking, Sex Slavery, Criminal Sexual Abuse, Kidnapping, and Rape

33.     On January 7, 2016, the Sheriff's Office, Prosecutor's Office, and Bellevue Police convened a joint press conference to announce the arrests.  John Urquhart, Dan Satterberg, and Steven Mylett spoke on behalf of their offices in their official capacities as King County Sheriff, King County Prosecutor, and Bellevue Police Chief, respectively.  The press conference was attended by various media outlets.

34.     At the press conference, former Sheriff Urquhart, Chief Mylett, and Mr. Satterberg began a coordinated campaign to defame and publicly humiliate Plaintiffs by, among other things, publishing false and misleading statements that directly, or by implication, accused Plaintiffs of various criminal activity.

35.     Specifically, Sheriff Urquhart, Chief Mylett, and Mr. Satterberg improperly and purposefully conflated Plaintiffs' arrests and charges for promoting prostitution in the second degree—which do not entail force, fraud or coercion—with crimes involving human trafficking, sex slavery, criminal sexual abuse, kidnapping, and rape—which do entail force, fraud or coercion.

        i.     <u>Former Sheriff Urquhart's Statements</u>

36.     At the very outset of the press conference, Sheriff Urquhart linked Plaintiffs' arrests to human trafficking, stating: "***This is a prostitution case.  This is a human trafficking case is a better way to put this***."

37.     Sheriff Urquhart then reinforced the alleged "human trafficking" component of Plaintiffs' arrests, repeatedly asserting that the dozen women purportedly "rescued" during the operation "were trafficked" and held in "debt bondage situations."

COMPLAINT – Page 8

38.     For example, Sheriff Urquhart stated:

*The women were trafficked*.  From what we can determine, *they were brought into this country* either illegally through Canada, or they overstayed their visa.  And *many of them were debt bondage situations* where their families in South Korea owed a debt to pay to organized criminals in South Korea and they had to pay off that debt.

39.     He later stated: *"So [the women] were brought over here, like this one here, and held more or less – well, no, against their will in these brothels."*  And, he then repeated: *"These women were trafficked!"*

40.     Moreover, in response to a specific question about how the King County Sheriff's Office became involved in investigating the case, Sheriff Urquhart again doubled-down on linking human trafficking to Plaintiffs' case. He said: "*We look at human trafficking on an ongoing basis* . . . We are interested on the demand side particularly. *And on the human trafficking aspect of it, because it's a much more serious crime*."

41.     These statements, directly or by implication, created impressions that the women were trafficked and "many of them were debt bondage situations," and Plaintiffs were involved in their trafficking and debt bondage. The impressions created were false.

42.     At the time he made these statements, Sheriff Urquhart had no evidence that Plaintiffs had engaged in the nefarious criminal conduct (*e.g.*, crimes involving force, fraud or coercion) referenced above, or that the women "rescued" during the operation had been victims of human trafficking.   Yet, he continued to falsely associate Plaintiffs with that criminal conduct.

    ii.     Chief Mylett's Statements

43.     Chief Mylett spoke after Sheriff Urquhart at the press conference and expanded on the human trafficking theme.  He announced that the operation had rescued twelve trafficked women, linked Plaintiffs' arrests with their purported trafficking, and accused Plaintiffs of committing non-consensual sexual acts on the women by force.

COMPLAINT – Page 9

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

44.     For example, Chief Mylett stated:

> *In cases such as this*, the sexual contact was not consensual, and *these women were being forced to perform sexual acts through exploitation, force and coercion*.  *In this case*, these victims were transported to the United States from South Korea for one purpose and one purpose only.  To provide sexual services to a network of criminals who have no concern for their physical, mental or emotional welfare.  Period.  They do not care that these women are forced into situations for the various reasons that they are.  They have one thing on their mind and that is to use these victims for their own sexual pleasure, gratification and, in some cases, financial gain.

45.     Separately, he added: "*These women are being abused! They're being raped! They're being murdered!*"

46.     Moreover, Chief Mylett referenced an entirely unrelated March 2015 murder of a Thai prostitute—*i.e.*, the Kittaporn Saosawatsri case.  When specifically asked whether there was any connection between Plaintiffs' case and the Saosawatsri case, Chief Mylett omitted clearly stating that there was no connection.  Instead, he stated "there could be."

47.     These statements, directly or by implication, created impressions that the women were trafficked, that Plaintiffs were involved in human trafficking, that Plaintiffs had abused, raped, or committed forcible sexual acts on the women, and that Plaintiffs were connected to the Saosawatsri murder case. The impressions created were false.

48.     At the time he made these statements, Chief Mylett had no evidence that Plaintiffs had engaged in or were connected to the nefarious criminal conduct (*e.g.*, crimes involving force, fraud or coercion) referenced above.   Yet, he continued to falsely associate Plaintiffs with that criminal conduct.

      iii.     Prosecutor Satterberg's Statements

49.     Speaking after Sheriff Urquhart and Chief Mylett, Mr. Satterberg, on behalf of the Prosecutor's Office, furthered the human trafficking narrative, making statements linking Plaintiffs' arrests to human trafficking and sex servitude.

COMPLAINT – Page 10

50.     At the outset of his remarks, Mr. Satterberg stated: "It just so happens that January is **National Human Trafficking Awareness month.  This is what human trafficking looks like.**"

51.     He then stated that the dozen or so arrested men (including Plaintiffs) were engaged in "criminal sexual abuse" and that the women were brought to the United States against their will to pay off debts.  Specifically, he asserted:

> *They euphemistically called themselves hobbyists.  And their hobby was the criminal sexual abuse of women brought here, against their will, in servitude to pay off debts back in Korea.*

52.     Then, speaking directly about the "dozen exploited women . . . recovered in this operation," he reiterated: "**We consider these victims of human trafficking.**"

53.     Mr. Satterberg later reinforced that *this case* was about trafficking and asserted that the women were "abused and commercially raped" by Plaintiffs.  He stated:

> They were victims.  **They were trafficked.**  They were **abused and commercially raped** by men here in King County.  **That's what this case is about.**  And that's what is fueling us.  **Because this is an international human trafficking ring.**  It's right here in King County, Washington.  And we're offended by it.

54.     These statements, directly or by implication, created impressions that the women at issue were trafficked, that Plaintiffs were involved in their trafficking, and that Plaintiffs had engaged in "abuse," "commercial rape," "criminal sexual abuse," debt bondage and other criminal activity (beyond the alleged charge).  The impressions created were false.

55.     At the time he made these statements, Mr. Satterberg had no evidence that Plaintiffs had engaged in the nefarious criminal conduct (*e.g.*, crimes involving force, fraud or coercion) referenced above, or that the women "recovered" in the operation had been victims of human trafficking.  Yet, he continued to falsely associate Plaintiffs with that criminal conduct.

COMPLAINT – Page 11

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

**D. The January 7, 2016 Press Release and Continuing Accusations of Human Trafficking and Crimes of Force, Fraud, and Coercion**

56.     Furthering the human trafficking narrative of the January 7, 2016, Press Conference, King County and the City of Bellevue jointly issued the same day a Press Release titled "Historic Raid Dismantles National Sex Trafficking Website, Shuts Down Brothels, and Charges Multiple Suspects with Unprecedented Felony Charges."

57.     Among other things, the Press Release included quotations from Chief Mylett, Sheriff Urquhart, and Mr. Satterberg that, again, claimed this was a human trafficking case and linked Plaintiffs' arrests to human trafficking.

58.     In the Press Release, Chief Mylett stated:

The investigation highlights the fact that **human trafficking and sexual exploitation** in all its forms, including **crimes involving force, fraud and coercion** are happening in communities through this nation every day.

59.     Likewise, former Sheriff Urquhart stated:

The Sheriff's Office is committed to holding accountable those who prosper from the **crime of human trafficking**, and to freeing the victims of that crime to live a better life.

60.     Finally, Mr. Satterberg stated:

Because they had money, these men gained access to sexually abuse these vulnerable young women, then put their energies toward a campaign to encourage many more men to do the same. **This is what human trafficking looks like**.

61.     These statements, directly or by implication, reinforced the impressions that Plaintiffs were involved in human trafficking. The impressions created were false.

62.     At the time these statements were made, Chief Mylett, Sheriff Urquhart, and Mr. Satterberg had no evidence that Plaintiffs had engaged in the nefarious criminal conduct (*e.g.*, crimes involving force, fraud or coercion) referenced above.

COMPLAINT – Page 12

### E.  Defendants' False Statements Re-Published to Millions Across the Globe

63.     Defendants conflated human trafficking with Plaintiffs' arrests to maximize media attention and coverage.  Their efforts were successful.

64.     In reporting Plaintiffs' arrests, local and national media outlets zeroed in on the human trafficking narrative in the days following the press conference, including identifying Plaintiffs by name.  Defendants' false and misleading statements about Plaintiffs were thus re-published to millions of people across the globe.

65.     The following is a sample of some of the online and print news reports that immediately followed the Press Conference:

a.  **SEATTLE TIMES**—January 7, 2016

The Seattle Times covered the arrests with the by-line: "A Seattle-area investigation has resulted in the shutdown of two *sex-trafficking* websites, the shuttering of 12 brothels and the arrest of about a dozen people."

Echoing statements from Sheriff Urquhart, the Seattle Times also reported that "[m]any of the women were forced to work as prostitutes . . . to pay off debts."  The Seattle Times article identified several of the arrestees, including plaintiffs Keith Emmanuel, Richard Homchick, and Charles Peters.

b.  **KIRO 7—SEATTLE**—January 7, 201 6

KIRO 7 ran a story online at www.kiro7.com/news/law-enforcement-discuss-local-**human-trafficking**-in/40004451,   and the headline: "Police: Workers Held Against Their Will in Bellevue Brothels."

In a section titled, "Key Developments," the story reported, among other things, that ***"[a]t least one recent murder is related to the trafficking case***," apparently in reference to Chief Mylett's statement concerning the Saosawatsri case.  The story also identified several of the arrestees, including plaintiffs Keith Emmanuel and Charles Peters.

COMPLAINT – Page 13

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

c. **KOMO NEWS—SEATTLE**—January 7, 2016

KOMO News referred to the 14 arrests (among which were Plaintiffs) as the "***human trafficking arrests***."

d. **KING5 NEWS—PORTLAND**—January 7, 2016

King5 News of Portland ran the following headline to report the arrests: "12 Women Rescued in Puget Sound ***Human Trafficking*** Bust."

Citing Sheriff Urquhart, the article further stated that the group of men that was arrested ran a website that "was used to further ***illegal human trafficking***."

e. **REUTERS**—January 7, 2016

REUTERS reported the arrests in its opening paragraph as follows: "A group of Seattle men has been charged with using adult websites ***to promote the sex-trafficking of women*** from South Korea held inside a network of brothels in upscale Seattle area apartments."

f. **KR MAGAZINE**—January 8, 2016

KR MAGAZINE, which, according to its website, is dedicated to providing "specialty insight into current trends in kidnapping for ransom," ran the following headline: "***USA: Twelve Korean Women Freed From Sex Trafficking Ring, Thirteen Men Charged For Their Involvement***."

g. **OLYMPIAN**—January 16, 2016 (original story - January 11, 2016)

OLYMPIAN ran a story on Richard Homchick, with his photograph, reporting that he was one of the individuals charged "in connection with a prostitution and ***sex-trafficking ring*** involving Korean women in King County." The article referenced defendants' statements concerning debt-bondage, namely noting: "***Investigators say nearly all of the exploited women were brought to the United States from South Korea and were forced into prostitution to pay off debts***."

h. **HUFFINGTON POST**—January 27, 2016

HUFFINGTON POST reported that, in a recent interview, Chief Mylett had described the arrests as having broken up a "***well-organized ring promoting sex slavery***."

COMPLAINT – Page 14

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

66.     In addition to the above (and other) print and online publications in the immediate aftermath of the press conference, radio and television outlets also published, with one or more Defendants' direct participation, the human trafficking narrative as to Plaintiffs' arrests.

67.     The following is a sample of the radio and television coverage of Plaintiffs' arrests in the months following the press conference.

a.   **NATIONAL PUBLIC RADIO (NPR)**—September 10, 2016

NPR covered a story about Plaintiffs' case (a.k.a. the "League" case) titled "Against Their Will." In the segment, the reporter likened the "small group of men" in the League to an "organized crime" syndicate and referenced a particular South Korean woman who was purportedly connected to the League and purportedly "***forced into prostitution to pay off a loan shark in Korea***."

b.   **RON AND DON SHOW - KIRO RADIO SEATTLE**—February 28, 2017

The Ron and Don Show hosted Mr. Richey, in his capacity as a King County deputy prosecutor, and opened a segment on Plaintiffs' prosecutions as follows:

"***Sex trafficking going on over in Bellevue. You [Val Richey] prosecuted the League [i.e., Plaintiffs'] case . . . these are women that are brought in internationally. They are brought into high rises. They are basically sex slaves.***"

c.   **ABC NEWS—NIGHTLINE**—June 27, 2017

ABC News—Nightline covered the so-called League case, which included interviewing Mr. Richey. The anchor introduced the story as follows: "***Many of these women were trapped in this lurid world of sex trafficking by debt and fear.***" The report then re-published some of the news headlines following Plaintiffs' arrests to a national audience, including "***Twelve Korean Women Freed From Sex Trafficking Ring, Thirteen Men Charged For Their Involvement***" (from KR Magazine).

68.     The above and other media coverage, and Defendants' conduct related to that coverage, further harmed Plaintiffs and cast them in a false and nefarious light.

COMPLAINT – Page 15

69.     Upon information, Demand Abolition-funded media consultants connected, in whole or in part, the Prosecutor's Office and/or the Sheriff's Office to the above (and other) media outlets.

### F. Defendants' Failures to Correct the False Narratives

70.     In each of the above examples, Defendants failed to take steps to clarify or correct the false and misleading narratives about Plaintiffs' arrests in the media.

71.     To the contrary, Defendants—especially the Prosecutor's Office—have continued to perpetuate the false or misleading connections between Plaintiffs and human trafficking, including by withholding material information from certain news outlets and their audiences.

72.     For example, in the case of the above-referenced NPR story, Mr. Richey knew or recklessly disregarded that the South Korean woman referenced in the story, to the extent she was even a victim of debt bondage, had no connection to the alleged "League." Yet, Mr. Richey, who communicated with the NPR reporter, did not provide that material information to NPR and its audience, thereby ensuring that the false or misleading connection would remain.

73.     Likewise, with respect to the Ron and Don Show and ABC Nightline story, Mr. Richey declined to clarify that there was no evidence linking Plaintiffs to human trafficking, despite appearing on the shows and having ample opportunity to do so.

### G. Defendants' Malicious and Reckless Conduct Continued Post-Press Conference

74.     In addition to media coverage, Defendants perpetuated falsehoods in other forums and committed additional improper acts against Plaintiffs:

COMPLAINT – Page 16

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

i.   Submitting a False Affidavit in Court

75.     On September 9, 2016, the Prosecutor's Office filed criminal charges against an individual named Ying Leun Wun for attempted promoting prostitution in the second degree.  In the Certification of Probable Cause, Detective Mike Garske of the Sheriff's Office stated that Mr. Wun had received an email from plaintiff Charles Peters and, in so doing, labeled Mr. Peters a "*convicted human trafficker*."

76.     That statement made under the penalty of perjury was false.  Mr. Peters was never charged with human trafficking, let alone convicted of the crime of human trafficking or any other crime.

77.     At the time he made the statement, Detective Garske, as an agent of the Sheriff's Office, knew or, at a minimum, recklessly disregarded that the statement was false.

78.     The Prosecutor's Office never corrected the false statement.   Instead, it facilitated the falsehood by filing Detective Garske's false statement about Mr. Peters with the Court and into the public record.

ii.   Threatening to Add Sexual Motivation Enhancements to Criminal Charges to Coerce Pleas

79.     Beyond filing what in their own words were "unprecedented felony charges" against alleged customers of adult prostitutes, and issuing misleading public statements linking them to rape and human trafficking, the Prosecutor's Office also threatened to add sexual motivation enhancements to the charges made against Plaintiffs (among others) which would require them to register as sex offenders if convicted.

80.     The Prosecutor's Office engaged in this conduct despite the fact that the enhancement has, upon information and belief, never been added to charges in this context.

81.     The enhancement threat, along with the misleading public statements linking the arrestees to human trafficking and other uncharged crimes, was coercive and did, in fact, coerce a guilty plea from plaintiff Richard Homchick (among other arrestees).

COMPLAINT – Page 17

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

iii.   <u>Publishing Plaintiffs' Photographs During a Domestic Violence Symposium</u>

82.     On or about September 7, 2017, Detective Luke Hillman of the Sheriff's Office presented at a Domestic Violence Symposium at Seattle University School of Law. The presentation was titled "In a 'League' of their Own: Hobbyists, Review Boards, Toxic Masculinity, Male Bonding and Commercial Sexual Exploitation."

83.     During the presentation, Detective Hillman and another speaker made several references to human trafficking and then posted Plaintiffs' photographs and other identifying information in a PowerPoint.

84.     At the time Detective Hillman posted the photographs, plaintiffs Charles Peters and Keith Emmanuel had ongoing prosecutions for prostitution and, by operation of law, were not guilty of any charged crime.  On the other hand, plaintiff Richard Homchick had accepted a plea deal with the legitimate expectation that his punishment for the charged crime would end, not that he would be further humiliated or punished unabated, including being associated with crimes that he was never charged with and did not commit.

85.     Upon information, the presentation was attended in-person by several dozens of individuals in the Seattle community, and the PowerPoint with Plaintiffs' photographs was then re-published online where it was made widely accessible to the general public.

86.     Upon information, Defendants continue to use and publish Plaintiffs' photographs in various settings in discussing human trafficking and sex slavery.

**H. Defendants' Utter Disregard for Plaintiffs' Rights and Fairness in the Pursuit of Private Funding and Publicity**

87.     As described above, Defendants—especially King County—have sought out opportunities to obtain media coverage and maximize publicity around Plaintiffs' arrests.

88.     In doing so, Defendants have continued to date to conflate prostitution charges with charges of human trafficking with a clear purpose in mind: Defendants know that a story about "human trafficking" sells better than a story about "prostitution."   King County, in

COMPLAINT – Page 18

particular, has sought out this publicity due to undue external influences and apparent conflicts of interest.

89.     Between 2014 to present, King County has received hundreds of thousands of dollars from Demand Abolition and/or the Foundation.  Upon information, these dollars have funded in significant part the annual salary of Mr. Richey on the condition and/or with the expectation that King County will increase the number of arrests and prosecutions of "Johns," as well as the publicity around those arrests.  Upon information, Demand Abolition has also paid for travel, lodging and other costs for Mr. Richey (among other King County agents) to attend conferences and symposiums across the country to discuss King County's work.

90.     By soliciting, receiving, and maintaining funds from a private, special interest group in exchange for (i) increasing the number of arrests of a certain category of individuals (here, alleged "Johns") and committing to lower prostitution demand by specific metrics, (ii) generating publicity about and drawing national media attention to the arrestees (including Plaintiffs), and (iii) linking the arrestees (including Plaintiffs) with human trafficking and other acts of force, fraud or coercion, whether or not, in fact, that is actually the case; as well as, among other things, filing unprecedented charges, making threats to add improper enhancements against those arrested, and filing a false affidavit(s)—King County and its agents have abused normal processes and placed personal and private third-party interests over Plaintiffs' rights.

## V.  CAUSES OF ACTION

### COUNT ONE
### Violation of 42 U.S.C. § 1983 – Abuse of Process

91.     Plaintiffs incorporate by reference the allegations as set forth above.

92.     Defendants were at all times acting under the color of the laws of the State of Washington.

COMPLAINT – Page 19

93.     By virtue of the conduct alleged herein, Defendant King County and its agents misused the criminal justice process for ulterior purposes to accomplish an object not within the proper scope of process and not proper in the regular prosecution of the proceedings.

94.     Defendant King County and its agents acted with willful, wanton, and reckless disregard of and deliberate indifference to Plaintiffs' Constitutional rights.

95.     By virtue of the conduct alleged herein, Defendant King County failed to train and/or supervise its employees with deliberate indifference to the rights of Plaintiffs.

96.     As a direct and proximate result of Defendant King County and its agents' unlawful conduct, Plaintiffs have been harmed and are entitled to damages, including attorney's fees, in an amount to be proven at trial, as well as equitable and other relief.

97.     Defendant King County and its agents subjected Plaintiffs to such deprivations by malice and a reckless and conscious disregard of their rights for which an award of punitive damages is warranted.

## COUNT TWO
## Violation of 42 U.S.C. § 1983 – Due Process

98.     Plaintiffs incorporate by reference the allegations as set forth above.

99.     Defendants were at all times acting under the color of the laws of the State of Washington.

100.    Plaintiffs have liberty or property interests protected by due process.

101.    By virtue of the conduct alleged herein, Plaintiffs suffered injuries, including but not limited to injury to their reputation and emotional well-being, from Defendant King County and its agents' conduct, and one or more Plaintiffs further suffered a state-imposed burden or alteration of status or rights.

102.    By virtue of the conduct alleged herein, Defendant King County failed to train and/or supervise its employees with deliberate indifference to the rights of Plaintiffs.

COMPLAINT – Page 20

103.    As a proximate cause of Defendant King County and its agents' conduct, Defendant King County has deprived one or more Plaintiffs of their liberty interest and otherwise betrayed the principles of fundamental fairness.

104.    Plaintiffs are entitled to damages, including attorney's fees, in an amount to be proven at trial, as well as equitable and other relief.

105.    Defendant King County and its agents subjected Plaintiffs to such deprivations by malice and a reckless and conscious disregard of their rights for which an award of punitive damages is warranted.

**COUNT THREE**
**Defamation**

106.    Plaintiffs incorporate by reference the allegations as set forth above.

107.    By virtue of the conduct alleged herein, Defendants King County and City of Bellevue, by and through their agents acting individually or in their official capacities, have made false statements of and concerning Plaintiffs linking Plaintiffs to crimes and/or criminal activity for which they were not charged and which they did not commit.

108.    Specifically, Defendants King County and City of Bellevue, by and through their agents, have made false and misleading statements that Plaintiffs were involved in, among other things, the crimes of human trafficking, sex slavery, criminal sexual abuse, force, kidnapping, and rape, or have otherwise juxtaposed a series of facts concerning such criminal activity and Plaintiffs so as to imply a defamatory connection or create a defamatory implication by omitting facts.

109.    Defendants acted with malice in making the statements because they knew the statements at issue and the impressions created were false or they acted with reckless disregard to their falsity.

COMPLAINT – Page 21

110.    The recipients of Defendants' messages understood them to be of or concerning Plaintiffs.  In response, many of the recipients re-published the false statements, and for which Defendants are directly responsible.

111.    Defendants' false statements were not privileged or, to the extent any privilege existed at the outset, the privilege was abused and therefore vitiated.

112.    The false statements at issue are defamatory per se and damages are presumed.

113.    Defendants King County and City of Bellevue are vicariously liable for the acts of their agents, including but not limited to former Sheriff John Urquhart, Detective Mike Garske, Detective Luke Hillman, Prosecutor Dan Satterberg, Senior Deputy Prosecutor Val Richey, and Chief Mylett.

114.    As a proximate cause of the statements and publications, Plaintiffs have suffered reputational harm, including loss wages and loss of income opportunity, and harm to their emotional and physical well-being.

115.    Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT FOUR
## False Light / Invasion of Privacy

116.    Plaintiffs incorporate by reference the allegations as set forth above.

117.    By virtue of the conduct alleged herein, Defendants King County and City of Bellevue, by and through their agents acting individually or in their official capacities, have made and published statements that placed Plaintiffs in a false light.

118.    Specifically, Defendants King County and City of Bellevue, by and through their agents, have made false and misleading statements that Plaintiffs were involved in, among other things, the crimes of human trafficking, sex slavery, criminal sexual abuse, force, kidnapping, and rape concerning Plaintiffs, or have otherwise juxtaposed a series of facts concerning such criminal activity and Plaintiffs so as to imply a defamatory connection or create a defamatory implication by omitting facts.

COMPLAINT – Page 22

119.     The statements made and published would be highly offensive to a reasonable person and were and continue to be highly offensive to Plaintiffs.

120.     Defendants acted with malice in making the statements because they knew the statements at issue and impressions created were false or they acted with reckless disregard to their falsity.

121.     The recipients of Defendants' messages understood them to be of or concerning Plaintiffs.  In response, many of the recipients re-published the statements that cast Plaintiffs in a false light, and for which Defendants are directly responsible.

122.     Defendants' false statements were not privileged or, to the extent any privilege existed at the outset, the privilege was abused and therefore vitiated.

123.     Defendants King County and City of Bellevue are vicariously liable for the acts of their agents, including but not limited to former Sheriff John Urquhart, Detective Mike Garske, Detective Luke Hillman, Prosecutor Dan Satterberg, Senior Deputy Prosecutor Val Richey, and Chief Mylett.

124.     As a proximate cause of the statements and publications, Plaintiffs have suffered harm to their emotional and physical well-being, including humiliation, mental anguish, anxiety, mortification, loss of good health and emotional and physical distress.

125.     Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT FIVE
## Aiding and Abetting Defamation

126.     Plaintiffs incorporate by reference the allegations as set forth above, including specifically for Count Three–Defamation.

127.     By virtue of the conduct alleged herein, Defendants acted in concert and knowingly collaborated and participated in juxtaposing a series of facts concerning human trafficking and sex slavery, among other criminal conduct, so as to imply a defamatory

COMPLAINT – Page 23

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

connection between that conduct and Plaintiffs or create a defamatory implication by omitting facts.

128. The false statements at issue are defamatory per se and damages are presumed.

129. As a proximate cause of Defendants' conduct, Plaintiffs have suffered reputational harm, including loss wages and loss of income opportunity, and harm to their emotional and physical well-being.

130. Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT SIX
### Aiding and Abetting False Light / Invasion of Privacy

131. Plaintiffs incorporate by reference the allegations as set forth above, including specifically Count Four–False Light / Invasion of Privacy.

132. By virtue of the conduct alleged herein, Defendants acted in concert and aided and abetted each other in juxtaposing a series of facts concerning human trafficking and sex slavery, among other criminal conduct, so as to imply a defamatory connection between that conduct and Plaintiffs or create a defamatory implication by omitting facts.

133. As a proximate cause of Defendants' conduct, Plaintiffs have suffered harm to their emotional and physical well-being, including humiliation, mental anguish, anxiety, mortification, loss of good health and emotional and physical distress.

134. Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT SEVEN
### Intentional Infliction of Emotional Distress

135. Plaintiffs incorporate by reference the allegations as set forth above.

136. By virtue of the conduct alleged herein, Defendants engaged in extreme and outrageous conduct, intended to, or with reckless disregard that it would, inflict emotional distress; and that actually caused Plaintiff severe emotional distress.

137. Defendants King County and City of Bellevue are vicariously liable for the

COMPLAINT – Page 24

SPIRO HARRISON
500 UNION STREET, SUITE 800
SEATTLE, WASHINGTON 98101
T 206.899.1996   F 973.232.0887

acts of their agents, including but not limited to former Sheriff John Urquhart, Detective Mike Garske, Detective Luke Hillman, Prosecutor Dan Satterberg, Senior Deputy Prosecutor Val Richey, and Chief Mylett.

138.    As a proximate cause of Defendants' actions, Plaintiffs have suffered harm to their emotional and physical well-being, including humiliation, mental anguish, anxiety, mortification, loss of good health and emotional and physical distress.

139.    Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT EIGHT
## Negligent Infliction of Emotional Distress

140.    Plaintiffs incorporate by reference the allegations as set forth above.

141.    By virtue of the conduct alleged herein, Defendants engaged in negligent conduct in gross disregard that it would inflict emotional distress; and that actually caused Plaintiff severe emotional distress.

142.    Defendants King County and City of Bellevue are vicariously liable for the acts of their agents, including but not limited to former Sheriff John Urquhart, Detective Mike Garske, Detective Luke Hillman, Prosecutor Dan Satterberg, Senior Deputy Prosecutor Val Richey, and Chief Mylett.

143.    As a proximate cause of Defendants' conduct, Plaintiffs have suffered harm to their emotional and physical well-being, including humiliation, mental anguish, anxiety, mortification, loss of good health and emotional and physical distress.

144.    Plaintiffs are entitled to damages in an amount to be proven at trial.

COMPLAINT – Page 25

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants as follows:

A.     For temporary, preliminary, and permanent injunctive relief prohibiting Defendants, its agents, or anyone working for, in concert with or on behalf of Defendants, from making false or misleading statements about Plaintiffs, as set forth above;

B.     For monetary relief, including wage loss and benefits, damages for defamation and lost career opportunities, and damages to emotional and physical well-being, including but not limited to humiliation, mental anguish, anxiety, mortification, loss of good health and emotional and physical distress;

C.     For punitive damages, in an amount to be determined at trial;

D.     For attorney's fees, costs, and expenses to the full extent permitted by law;

E.     Such other and further relief as this Court may deem just and proper.

DATED:  March 13, 2018

**SPIRO HARRISON**

By  */s/* Hozaifa Y. Cassubhai
     Hozaifa Y. Cassubhai, WSBA No. 39512
     500 Union Street, Suite 800
     Seattle, Washington 98101
     Phone: 206.899.1996
     Fax: 973.232.0887
     Email: hcassubhai@spiroharrison.com

*Attorneys for Plaintiffs*

COMPLAINT – Page 26