1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10  KEITH EMMANUEL, et al.,

11                          Plaintiffs,

     v.

12

13  KING COUNTY, et al.,

14                          Defendants.

CASE NO. C18-0377JLR

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

15              **I.      INTRODUCTION**

16       Before the court is Defendants King County, King County Prosecutor Daniel

17  Satterberg, and King County Sheriff John Urquhart's motion for summary judgment.

18  (*See* MSJ (Dkt. # 61).)  Plaintiff Richard Homchick opposes the motion.  (*See* Resp. (Dkt.

19  # 75-2).[1])  The court has considered the motion, the parties' submissions in support of

20  and in opposition to the motion, the relevant portions of the record, and the applicable

21  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

22       [1] As discussed below, the court considers Mr. Homchick's "corrected" response and
     refers to it as his response in this order.  *See infra* § III.A.

1  law.  Being fully advised,[2] the court GRANTS Defendants' motion for summary

2  judgment.

## II.    BACKGROUND

**A.    Factual Background**

   1.  <u>King County's Efforts to Combat Prostitution and Trafficking</u>

   This case involves an investigation into the exploitation of women through

prostitution and the aftermath of that investigation.  Beginning in 2012, Prosecutor

Satterberg directed his criminal division to explore effective "anti-demand strategies" to

address the widespread problem of commercial sex exploitation.  (*See* Clark Decl. (Dkt.

# 63) ¶ 5.)  Data suggested that only about 196 of the 100,000 sex buyers in King County

were charged each year for buying sex.  (*Id.* ¶ 7.)  The King County Prosecuting

Attorney's Office ("KCPAO") began working with other law enforcement agencies on its

strategies, and their efforts became known as "Operation No Impunity."  (*Id.* ¶ 6; 1st

Montgomery Decl. ¶ 7, Ex. L ("Handout").)  KCPAO also focused its efforts on public

information and education strategies, with one goal being to inform potential sex buyers

---

[2] Mr. Homchick and Defendants request oral argument.  (*See* MSJ at 1; Resp. at 1.)  Oral argument is not necessary where the non-moving party suffers no prejudice.  *See Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984); *Mahon v. Credit Bureau of Placer Cty. Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999) (holding that no oral argument was warranted where "[b]oth parties provided the district court with complete memoranda of the law and evidence in support of their respective positions," and "[t]he only prejudice [the defendants] contend they suffered was the district court's adverse ruling on the motion.").  "When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument]."  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  Here, the issues have been thoroughly briefed by the parties, and oral argument would not be of assistance to the court.  *See* Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court DENIES the parties' requests for oral argument.

1    of the risks and impacts of their activities.  (Clark Decl. ¶ 7.)  Between November 2014,

2    and April 2016, KCPAO suggests it impacted over 1.67 million buyer disruptions,

3    including 334 prosecutions.  (*Id.* ¶ 8.)

4         An advocacy group, Demand Abolition, awarded $205,001.00 in grants to

5    KCPAO, including a $50,000 grant in early 2014.  (*Id.* ¶¶ 9-10.)  Demand Abolition

6    seeks to "eradicate[e] the illegal commercial sex industry in the U.S. by combatting the

7    demand for purchased sex and increasing accountability for buyers."  (*See* 2nd Cassubhai

8    Decl. (Dkt. # 74-1) ¶ 4, Ex. 37.)  Additionally, representatives from KCPAO and

9    Demand Abolition communicated frequently during the Operation No Impunity

10   investigation.  (*See, e.g.*, *id.* ¶ 4, Ex. 35.)

11        2.  Mr. Homchick's Promotion of Prostitution and Arrest

12        Mr. Homchick began buying sex in 2010.  (1st Montgomery Decl. (Dkt. # 62) ¶ 3,

13   Ex. C ("Homchick Dep.") at 52:17-25.)  By 2014, he began buying sex about twice a

14   month, and by 2016, the frequency increased to once a week.  (*Id.* at 53:15-16.)  Over this

15   period, he saw between 30 and 40 different prostituted persons who were typically

16   Korean nationals.  (*Id.* at 100:24-101:2.)  Mr. Homchick frequently wrote reviews of his

17   visits under the screen name "Spider Rico" on The Review Board ("TRB"), a

18   password-protected website that served as "a marketplace based upon transactions for sex

19   exchanging" that would "connect[] users with providers."  (*Id.* at 101:23-103:7; 1st

20   Montgomery Decl. ¶ 6, Ex. E ("Proffer") at 8:20-24, ¶ 5, Ex. D ("Homchick Reviews").)

21   Mr. Homchick stated that he wrote reviews in order to help the women he visited "stay

22   busy" and make a "revenue stream."  (Proffer at 12: 20-25.)

1   Based largely on his online reviews, Mr. Homchick was invited to and joined a

2   group that calls itself the League of Extraordinary Gentlemen ("the League"), an

3   "exclusive group of men dedicated to the commercial sexual exploitation of women,

4   particularly foreign women brought into . . . the United States for prostitution purposes."

5   (Proffer at 22:20-22.)  Members of the League operated additional websites, including

6   *www.theloeg.net* and *www.kgirlsdelights.com*.  (1st Montgomery Decl. ¶ 2, Ex. B at 1.)

7   Mr. Homchick assisted *www.kgirlsdelights.com* by uploading pictures of prostituted

8   women.  (Homchick Dep. at 109:1-16.)  He was also involved in maintaining profiles on

9   *www.kgirlsdelights.com* for several different regions (*see* Proffer at 54:15-55:17) and

10   continued to post his own reviews, again under the "Spider Rico" screen name

11   (Homchick Dep. at 110:14-23 (testifying that "Spider Rico was known").)

12   While Mr. Homchick was engaging in the above activity, the King County

13   Sheriff's Office and the Bellevue Police Department were investigating the League's

14   activities.  (1st Montgomery Decl. ¶ 2, Ex. B at 1.)  That investigation led to Mr.

15   Homchick's arrest and that of several other men ("the Arrestees").  (*See* 1st Montgomery

16   Decl. ¶ 7, Ex. F ("Press Conf. Tr.").)

17   3.  Press Conference and Press Release

18   Mr. Homchick's claims against Defendants in this lawsuit largely revolve around

19   statements made at a press conference (the "Press Conference") and in a press release

20   (the "Press Release") announcing the results of the KCSO and BPD's investigation into

21   the League.  (*See* SAC (Dkt. # 58) ¶¶ 57-96.)  On January 7, 2016, Prosecutor Satterberg,

22   Sheriff Urquhart, and Bellevue Police Chief Steven Mylett held the Press Conference to

announce the results of the investigation, including several arrests.  (*See* Press Conf. Tr.)

During the Press Conference, Defendants made several statements that are at issue in this

case:

- Sheriff Urquhart:  Obviously this is a prostitution case.  This is a human trafficking case is a better way to put this.  (*Id.* at 3.)

- Sheriff Urquhart:  [The prostituted women] weren't allowed out for the most part.  They weren't given any money, to speak of, for the most part.  And they were trafficked up and down the West Coast to other similar situations.  (*Id.* at 6.)

- Sheriff Urquhart:  These women were trafficked.  They were true victims.  And this type of crime cannot continue in our area.  (*Id.* at 9.)

- Prosecutor Satterberg:  It just so happens that January is human trafficking awareness month.  This is what human trafficking looks like.  (*Id.* at 18-19.)

- Prosecutor Satterberg:  They euphemistically called themselves hobbyists.  And their hobby was the criminal sexual abuse of women brought here, against their will, in servitude to pay off debts back in Korea.  (*Id.* at 19-20.)

- Sheriff Urquhart:  [The prostituted women] were abused and commercially raped by men here in King County.  That's what this case is about.  And that's what is fueling us.  Because this is an international human trafficking ring.  It's right here in King County, Washington.  And we're offended by it.  (*Id.* at 39.)

- Police Chief Mylett:  [I]n cases such as this, the sexual contact was not consensual, and these women were being forced to perform sexual acts through exploitation, force and coercion.  (*Id.* at 16.)

- Police Chief Mylett:  These women are being abused, they're being raped, they're being murdered.  (*Id.* at 26.)

In conjunction with the Press Conference, KCPAO issued the Press Release.

(Clark Decl. (Dkt. # 63) ¶ 11, Ex. B ("Press Release").)  The Press Release described the

investigation, the arrests, and the activities of the League and the above-referenced

review websites.  (*See* Press Release at 1-3.)  In addition, the Press Release included the following statements:

- The investigation resulted in the filing of criminal charges against over a dozen suspects in connection with the sexual exploitation of women who were being brought into the United States and then prostituted.

- An investigation by the King County Sheriff's Office, with the assistance of the Bellevue Police Department and support from the F.B.I. and the King County Prosecutor's Office, culminated in the arrests of 11 men earlier this week who were local members of the online network that used its resources to promote prostitution and facilitate sexual exploitation.

- 'The Sheriff's Office is committed to holding accountable those who prosper from the crime of human trafficking, and to freeing the victims of that crime to live a better life,' said King County Sheriff John Urquhart.

- Bellevue Chief of Police Steve Mylett said, 'This investigation highlights the fact that human trafficking and sexual exploitation in all its forms, including crimes involving force, fraud, and coercion are happening in communities throughout this nation every day.  We will continue to work with our law enforcement partners and victim support organizations to hold the buyers and promoters of these criminal activities accountable for their involvement while identifying and assisting the victims of human trafficking in every possible way.'

- The large-scale investigation also focused on brothel owners, who established a pipeline of foreign women to the Pacific Northwest to meet the burgeoning demand for prostitution fostered by TRB and The League.  The brothels provided everything for the prostituted persons, including apartments, advertising, customers and condoms.  The prostituted individuals are typically foreign nationals who are transported from major city to major city so that there are always new workers and new 'experiences' for the brothels to advertise in order to meet the ever-growing online demand for commercial sex.  The women rarely, if ever, left the apartments, and were told by bookers and schedulers in Los Angeles and Dallas when they would be having sex, with whom, and where.  The brothels typically made the prostituted women available 12 to 14 hours a day, seven days a week.

- 'These charges reveal a part of our community that most people do not want to believe exists,' said King County Prosecutor Dan Satterberg.  'Because

they had money, these men gained access to sexually abuse these vulnerable young women, then put their energies toward a campaign to encourage many more men to do the same.  This is what human trafficking looks like,' he added.

(Press Release at 2-3.)  Defendants did not mention Mr. Homchick by name in the Press Release.  (*See generally id.*)

Finally, Defendants provided a handout ("the Handout") at the Press Conference detailing the Operation No Impunity investigation.  (*See* Handout.)  The Handout includes a review written by Mr. Homchick of one of his visits with a prostituted woman.  (*See id.* at 6.)

4.  <u>Mr. Homchick's Criminal Case and Guilty Plea</u>

KCPAO charged Mr. Homchick by information with one count of Promoting Prostitution in the Second Degree.  (*Id.* ¶ 2, Ex. H ("Information").)  On February 12, 2016, Mr. Homchick pled guilty by straight plea to the charged crime, admitting that he "did knowingly advance the profession of prostitution through my internet activities on websites such as:  thereviewboard.net, kgirldelights.com and through my email activities."  (*Id.* ¶ 2, Ex. I at 13-14.)  Mr. Homchick was sentenced based on the stipulated facts to zero days in custody, 120 hours of community service, a class, and standard assessments.  (*Id.* ¶ 2, Ex. J.)

As part of his plea agreement, Mr. Homchick stipulated to a number of facts, including that he "is a member of an exclusive group of men dedicated to the commercial sexual exploitation of women, particularly foreign women brought into the United States

//

1  for prostitution purposes." (*Id.* ¶ 2, Ex. B ("Prosecutor's Statement") at 1.)[3]

2  Additionally, Mr. Homchick stipulated that his actions promoting prostitution "directly

3  expanded and increased the market for exploited women in the region," that as a result of

4  his actions "numerous Asian brothels have sprung up in the region to respond directly to

5  the demand for prostitution," and that "[t]hese brothels serve as part of a national pipeline

6  that transports exploited women around the country for use in prostitution." (*Id.*) Mr.

7  Homchick further stipulated that he "maintained constant communication centered on

8  [his] obsession with sexual exploitation" and "contributed to a national network of

9  commercial sexual exploitation and personally engaged in this exploitation time and time

10  again." (*Id.*)

11  **B.    Procedural History**

12      Mr. Homchick initially brought this lawsuit on behalf of himself and two other

13  plaintiffs, Keith Emmanuel and Charles Peters, against King County, the City of

14  Bellevue, Sheriff Urquhart, Prosecutor Satterberg, and Police Chief Mylett. (Compl.

15  (Dkt. # 1) at 1.) Early in this case, Defendants filed a combined motion to dismiss under

16  Federal Rule of Civil Procedure 12(b)(6) based largely on *Heck v. Humphrey*, 512 U.S.

17  477 (1994), and a motion to stay the case pending the outcome of Mr. Homchick's

18  criminal case. (*See* MTD (Dkt. # 17).) In relevant part, the court denied the motion to

19  dismiss Mr. Homchick's federal claims. (7/6/18 Order (Dkt. # 25) at 13.) In doing so,

20

21  _____

   [3] Exhibit B to Mr. Montgomery's declaration includes both the prosecutor's statement
   and the certificate for determination of probable cause. The court cites to the prosecutor's
   statement as "Prosecutor's Statement" and the Certificate for Determination of Probable Case as

22  "Probable Cause Cert."

the court noted that "Mr. Homchick does not concretely identify how Defendants violated his right to due process." (*Id.* at 11.) Although the court did not dismiss Mr. Homchick's federal claims based on *Heck*, the court held that Mr. Homchick "cannot proceed on any theory that [his guilty] plea was not knowing and voluntary." (*Id.* at 12.)

On November 15, 2018, the court granted the parties' stipulated motion for Plaintiffs Keith Emmanuel and Charles Peters to voluntarily dismiss their claims pursuant to Federal Rule of Civil Procedure 41(a)(1). (11/16/18 Order (Dkt. # 36) at 2.) On April 2, 2019, the court granted the parties' stipulated motion to dismiss Mr. Homchick's claims against Police Chief Mylett and the City of Bellevue with prejudice. (4/2/219 Order (Dkt. # 43) at 3.)

On June 4, 2020, King County, Prosecutor Satterberg, and Sheriff Urquhart filed their present motion for summary judgment. (*See* MSJ.) The court now considers their motion.

### III.   ANALYSIS

**A.   Initial Matter**

Before turning to the merits of Defendants' summary judgment motion, the court first addresses an initial matter raised by Mr. Homchick's counsel. Mr. Homchick filed his response to Defendants' motion for summary judgment and three declarations on June 22, 2020. (*See* Orig. Resp. (Dkt. # 70); Homchick Decl. (Dkt. # 71); Reiten Decl. (Dkt. # 72); 1st Cassubhai Decl. (Dkt. # 73).) Mr. Cassubhai's first declaration included five exhibits. (*See* 1st Cassubhai Decl. ¶¶ 4-5, 8, Exs. A-E.) The following day, Mr. Homchick's counsel filed a praecipe (*see* 1st Praecipe (Dkt. # 74)) seeking to have the

1    court consider an additional declaration from Mr. Cassubhai (*see* 2nd Cassubhai Decl.).

2    Mr. Cassubhai's second declaration attaches 51 exhibits.  (*See* 2nd Cassubhai Decl. ¶ 4,

3    Exs. 1-51.)  Mr. Homchick's originally filed responsive brief cites to many of these

4    exhibits.  (*See generally* Orig. Resp.)  In the first praecipe, Mr. Homchick's counsel

5    states that "[t]he reason that these materials were not included with [Mr. Homchick's

6    responsive brief] is due to a number of complications that arose during undersigned

7    counsel's efforts to assemble the voluminous materials on his own, remotely away from

8    the usual office technology and support staff that would be accessible under normal

9    circumstances."  (*Id.* at 1-2.)

10       On June 24, 2020, Mr. Homchick's counsel filed a second praecipe.  (*See* 2nd

11   Praecipe (Dkt. # 75).)  The second praecipe seeks to substitute a "corrected" responsive

12   brief (*see* Resp.) that fixes "a number of record citations in the filed response in order to

13   conform with the submitted evidence" because "exhibit numbering was not final at the

14   time of the filing of the response."  (*Id.* at 2.)  Mr. Homchick's counsel represents in the

15   second praecipe that the "corrected" responsive brief "should mirror in all respects what

16   was sent to Defendants yesterday," with the exception of "fixing an inadvertent page

17   break."  (*Id.*)  Mr. Homchick's counsel also submitted a redlined version of the corrected

18   response.  (*See* Redlined Resp. (Dkt. # 75-1).)  Defendants do not address Mr.

19   Homchick's praecipes in their reply brief and cite to Mr. Homchick's "corrected"

20   response when referring to Mr. Homchick's response brief.  (*See, e.g.*, Reply (Dkt. # 76)

21   at 4.)

22   *//*

ORDER - 10

1    "Parties are expected to file accurate, complete documents, and the failure to do so

2    may result in the court's refusal to consider later filed corrections or additions to the

3    record."  Local Rules W.D. Wash. LCR 7(m).  Local Civil Rule 7(m) instructs parties to

4    file a praecipe "[i]n the event that an error is discovered."  *Id.*  A party filing a praecipe to

5    correct an error must include the corrected document and must specify the corrections by

6    line and page number.  *Id.*  "If the party seeks to add an additional document in support of

7    a previous filing, the praecipe must set forth why the document was not included with the

8    original filing and reference the original filing by docket number."  *Id.*

9        The court will consider Mr. Homchick's late filings in this instance.  Because both

10   parties refer to and rely on the corrected filings, and because Defendants have not raised

11   any opposition to the court considering the late filings, the court concludes that declining

12   to consider the late filings would serve to create confusion and risk deciding Defendants'

13   motion on a less-than-complete record.  However, the court cautions Mr. Homchick's

14   counsel that the problems with his filings appear to be due to a lack of preparation, not to

15   inadvertent errors.  Simply put, counsel failed to timely file nearly all the exhibits he

16   intended to attach to his client's responsive brief and included citations in his responsive

17   brief to exhibits that he had yet to file.  The court expects counsel to be more prepared in

18   the future.

19   **B.    Legal Standard**

20       Summary judgment is appropriate if the evidence viewed in the light most

21   favorable to the non-moving party shows "that there is no genuine dispute as to any

22   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

ORDER - 11

56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

## C.  Defamation

"A defamation action consists of four elements: (1) a false statement [about the plaintiff], (2) publication, (3) fault, and (4) damages."  *Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013).  A plaintiff can allege the false statement prong by alleging facts showing that the statement is provably false or "leaves a false impression due to omitted facts."  *See Yeakey v. Hearst Commc'ns, Inc.*, 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing

*Mohr v. Grant*, 108 P.3d 768, 773 (Wash. 2005)).  "Defamation by implication occurs when 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between them.'"  *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010) (quoting *Mohr*, 108 P.3d at 774).

Washington courts do "not require a defamation defendant to prove the literal truth of every claimed defamatory statement."  *Id.* at 775.  Rather, "[a] defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting,' is true."  *Id.* (quoting *Mark v. Seattle Times*, 635 P.2d 1081, 1092 (Wash. 1981)).  The court, not the jury, determines the "sting" of a report.  *See id.*  "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole."  *Id.* (quoting *Herron v. King Broad.*, 776 P.2d 98, 102 (Wash. 1989).  "Where a report contains a mixture of true and false statements, a false statement (or statements) affects the 'sting' of a report only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood."  *Herron*, 776 P.2d at 102.  To be actionable, the allegedly defamatory statement "must be a statement of fact, not a statement of opinion."  *Life Designs Ranch, Inc. v. Sommer*, 364 P.3d 129, 135 (Wash. Ct. App. 2015).  Additionally, courts are "bound to invest words with their natural and obvious meaning and may not extend language by innuendo or by the conclusions of the pleader."  *Lee v. Columbian, Inc.*, 826 P.2d 217, 219 (Wash. Ct. App. 1991) (internal quotation omitted).

A number of privileges and immunities may bar a defamation claim in some instances.  Under the fair report privilege, a report may not be the target of a defamation

1   claim if "(1) the report is attributable to an official proceeding and (2) the report is an

2   accurate or a fair abridgement of the official report."  *McNamara v. Koehler* 429 P.3d 6,

3   12 (Wash. Ct. App. 2018).  "[T]he fair report privilege applies to news media and other

4   types of media, including websites, webpages, and blogs, reporting on official public

5   proceedings, including judicial proceedings."  *Id.*  The privilege is not limited solely to

6   members of the traditional news media.  *Id.*  "For a report to be a fair abridgment of an

7   official proceeding, surgical precision is not required so long as the report is substantially

8   accurate and fair."  *Id.* (quoting *Alpine Indus. Computers, Inc. v. Cowles Pub. Co.*, 57

9   P.3d 1178, 1187 (Wash. Ct. App. 2002)).  "In the summary judgment context,

10   the plaintiff will not overcome the fair reporting privilege if the reviewing court

11   determines as a matter of law that the challenged report is a fair abridgment."  *Id.*

12   (quoting *Alpine*, 57 P.3d at 1187).

13         Additionally, law enforcement agencies have "a qualified privilege when releasing

14   information to the public or news media concerning official activities."  *Turngren v. King*

15   *Cty.*, 705 P.2d 258, 268 (Wash. 1985) (citing *Bender v. Seattle*, 664 P.2d 492 (Wash.

16   1983)).  However, "[a] person abuses the qualified privilege by making a statement

17   knowing it to be false or with reckless disregard as to its truthfulness."  *Id.*  "In order to

18   defeat a motion for summary judgment based upon a qualified privilege, the party

19   prosecuting an action for libel and slander must meet the limited burden of presenting

20   specific facts creating a genuine issue as to the question of whether the defendant's

21   statements were made after a fair and impartial investigation or upon reasonable grounds

22   //

1   for belief in their truth." *Id.* at 268-69 (citing *Twelker v. Shannon & Wilson, Inc.*, 564

2   P.2d 1131, 1134-35 (1977)).

3   　　　Mr. Homchick alleges that certain statements Defendants made at the Press

4   Conference, in the Press Release, and in the Handout defamed him.  (*See* SAC

5   ¶¶ 169-78.)  Defendants move for summary judgment on Mr. Homchick's defamation

6   claim on the basis that the statements do not meet the elements of a defamation claim.

7   (*See* MSJ at 13-16, 25-27.)  Additionally, Defendants challenge Mr. Homchick's

8   defamation claim on several other grounds, including that Mr. Homchick cannot show

9   malice or damages and that several privileges and immunities bar Mr. Homchick's claim.

10   (*Id.* at 17-19.)

11   　　　The statements at issue fall into two categories:  (1) statements that Mr. Homchick

12   contends accuse him of trafficking crimes, and (2) statements that Mr. Homchick

13   contends accuse him of additional crimes and abuse of women more generally.  The court

14   analyzes Defendants' motion for summary judgment with respect to each of these two

15   groups of statements.

16   　　　1.  Alleged Accusations of Criminal Trafficking

17   　　　The first grouping of statements that Mr. Homchick alleges defamed him relate to

18   the term "trafficking."  Among the statements Defendants made regarding trafficking

19   include the following:

20   　　• Sheriff Urquhart: Obviously this is a prostitution case.  This is a human
　　　trafficking case is a better way to put this.  (Press Conf. Tr. at 3.)

21

22   　　• Sheriff Urquhart: [The prostituted women] weren't allowed out for the most
　　　part.  They weren't given any money, to speak of, for the most part. And they

ORDER - 15

were trafficked up and down the West Coast to other similar situations.  (*Id.* at 6.)

- Sheriff Urquhart: These women were trafficked.  They were true victims. And this type of crime cannot continue in our area.  (*Id.* at 9.)

- Prosecutor Satterberg:  It just so happens that January is human trafficking awareness month.  This is what human trafficking looks like.  (*Id.* at 18-19.)

- 'The Sheriff's Office is committed to holding accountable those who prosper from the crime of human trafficking, and to freeing the victims of that crime to live a better life,' said King County Sheriff John Urquhart.  (Press Release at 2.)

- 'These charges reveal a part of our community that most people do not want to believe exists,' said King County Prosecutor Dan Satterberg.  'Because they had money, these men gained access to sexually abuse these vulnerable young women, then put their energies toward a campaign to encourage many more men to do the same.  This is what human trafficking looks like,' he added.  (*Id.* at 2.)

Additionally, the Press Release includes the following statement from Police Chief

Mylett, who is no longer a defendant in this case:

> Bellevue Chief of Police Steve Mylett said, 'This investigation highlights the fact that human trafficking and sexual exploitation in all its forms, including crimes involving force, fraud, and coercion are happening in communities throughout this nation every day.  We will continue to work with our law enforcement partners and victim support organizations to hold the buyers and promoters of these criminal activities accountable for their involvement while identifying and assisting the victims of human trafficking in every possible way.'

(*Id.* at 2.)

At a fundamental level, the parties dispute to what extent these statements

accuse Mr. Homchick himself of "trafficking," and whether "trafficking" as Defendants

used the term refers to a specific trafficking crime.  As Defendants' correctly point out,

Mr. Homchick's name was never mentioned in either the Press Conference or the Press

1    Release.  (*See generally* Press Conf. Tr.; Press Release.)  The only place Mr. Homchick's

2    name appeared was in the accompanying Handout, and only in reference to a single

3    review Mr. Homchick left on *www.thereviewboard.net*.  (*See* Handout at 3.)  Rather,

4    Defendants generally spoke about the Arrestees as a group of "12 to 14 members of The

5    League in the Seattle area."  (Press Conf. Tr. at 5.)

6         Mr. Homchick "must submit convincingly clear proof of his . . . identity as a target

7    of an allegedly libelous statement to withstand a defense motion for summary judgment."

8    *Camer v. Seattle Post-Intelligencer*, 723 P.2d 1195, 1200 (Wash. Ct. App. 1986) (citing

9    *Sims v. Kiro, Inc.*, 580 P.2d 642, 645 (Wash. Ct. App. 1978)).  "The identification of the

10   one defamed must be certain and apparent from the words themselves."  *Id.*  "One cannot

11   by implication identify oneself as the target of an alleged libel if the allegedly libelous

12   statement does not point to him or her."  *Id.*  "It is not necessary that the plaintiff be

13   mentioned by name in order to recover damages, but it is sufficient if the audience will

14   conclude from a perusal of the article that the plaintiff is the one against whom

15   publication is aimed."  *Id.*  Moreover,

16       "[o]ne who publishes defamatory matter concerning a group or class of
         persons is subject to liability to an individual member of it if, but only if:
17       (a) the group or class is so small that the matter can reasonably be understood
         to refer to the member, or (b) the circumstances of publication reasonably
18       give rise to the conclusion that there is particular reference to the member."

19   *Sims v. Kiro, Inc.*, 580 P.2d 642, 646 (Wash. Ct. App. 1978) (quoting Restatement

20   (Second) of Torts § 564A (1977)).

21       A review of the trafficking-related statements to which Mr. Homchick points

22   makes clear that they do not accuse the Arrestees of trafficking crimes, but rather relate

ORDER - 17

1   to other aspects of the "large-scale investigation" known as Operation No Impunity and

2   about the practice of trafficking and prostitution in the region generally.  That

3   investigation focused not only on those promoting prostitution and soliciting prostituted

4   women, but "also focused on brothel owners, who established a pipeline of foreign

5   women to the Pacific Northwest to meet the burgeoning demand for prostitution fostered

6   by TRB and The League."  (Press Release at 2.)  Therefore, statements that "these

7   women were trafficked" or about a broader criminal trafficking enterprise do not target

8   Mr. Homchick.

9          Additional statements Defendants made at the Press Conference specifically

10  distinguish the actions of the Arrestees accused of promoting prostitution—who included

11  Mr. Homchick—from the broader trafficking economy.  Defendants made clear that the

12  arrestees were being charged with the crime of promoting prostitution, not criminal

13  trafficking.  (*See, e.g.*, Press Conf. Tr. at 7 ("[W]e want to send a message to the men in

14  the Seattle area that want to think about starting a website like this, and you are

15  committing a crime of promoting prostitution in the second degree, and those are the

16  arrests we have made now. . . ."), 20 ("These defendants, we allege, promoted the

17  continued exploitation of these women on the site they called TheReviewboard.net.  They

18  solicited and encouraged other men to go and pay for sex with these women, and then to

19  post reviews of them.").)

20         Defendants further clarified their allegations against the Arrestees in response to

21  questions from the press.  For example, one member of the press stated that "promoting

22  prostitution is a Class C felony" that carries "one to three months," and asked if there

1   "was any talk" about "going after [the Arrestees] federally or with RICO." (Press Conf.

2   Tr. at 37-38.)  Prosecutor Satterberg responded:  "Well, promoting prostitution in this

3   case, for the members of The League and the people who put this Review Board together,

4   means that they simply got together to advance prostitution.  And I think that's an

5   accurate label. That may not be where the -- the end of this investigation.  It may lead us

6   to other places." (*Id.* at 38.)  Another question from the press was even more direct:

7   "What about using human trafficking charges?" (*Id.* at 39.)  Prosecutor Satterberg

8   responded:

9           Again, we're starting today with the crimes that we know that we can prove.
            We know that there are people, and they're not necessarily local, they may
10          be in other parts of the West Coast, that are more involved in the actual
            receipt of women who are forced, by their criminal counterparts in Korea, to
11          be part of this thing.  We know it goes much deeper than what we've seen
            today.
12

13  (*Id.* at 39.)  In response to another press question about whether the League was

14  "involved in bringing these women here at all," Sheriff Urquhart responded that for the

15  most part the League "was involved once they got here in promoting them," again

16  distinguishing the actions of the Arrestees from those who allegedly trafficked the

    women into the United States in the first place. (*Id.* at 42.)
17
            Given that Defendants repeatedly and clearly distinguished their accusations
18
    against the Arrestees from their statements about those who bring the women to the
19
    United States, Defendants' statements about the investigation and trafficking broadly
20
    cannot be read to accuse Mr. Homchick of a trafficking crime.  Similarly, broader
21
    statements about what "this case is about" are not about Mr. Homchick, because those
22

1    statements also refer to a broader investigation that goes beyond the Arrestees.  *See Sims*,

2    580 P.2d at 645 ("One cannot by implication identify himself as the target of an alleged

3    libel if the allegedly false statement does not point to him.").

4          Indeed, elsewhere in his responsive brief, Mr. Homchick appears to concede that

5    statements about Defendants' broader investigation are not about him.  (*See* Resp. at

6    21-22.)  In their motion, Defendants contend that even if the trafficking-related

7    statements targeted Mr. Homchick, Mr. Homchick admitted to involvement in trafficking

8    as part of the stipulation he entered as part of his plea agreement. (*See* Plea Agreement

9    (1st Montgomery Decl. ¶ 3, Ex. A ("Plea Agreement"); Prosecutor's Statement at 1.)  Mr.

10   Homchick stipulated that "[h]is actions were part of a sophisticated criminal enterprise

11   centered around 'trafficking' and 'human trafficking,' involving foreign nationals who

12   were 'trafficked from major city to major city' for sexual exploitation." (MSJ at 16

13   (quoting Prosecutor's Statement at 1).)  In response, Mr. Homchick argues that the

14   "Certification of Probable Cause and Prosecutor's Statement included background

15   information on the investigation that globally applied to all [D]efendants" and "any

16   reference to 'trafficking,' even under Defendants' personal definition of the term, did not

17   connote that Plaintiff himself was specifically involved in that conduct." (*See* Resp. at

18   21-22.)  In other words, for purposes of avoiding his admission of facts about trafficking,

19   Mr. Homchick contends the statements are generalized and not about him specifically;

20   but for purposes of withstanding summary judgment on his defamation claim, he

21   contends the opposite—that the even more general statements at the Press Conference

22   and in the Press Release specifically targeted him.  (*Id.*)  Mr. Homchick cannot have it

1    both ways.  Because Defendants' statements about trafficking crimes were not about Mr.

2    Homchick, Defendants are entitled to summary judgment on Mr. Homchick's defamation

3    claim to the extent it rests on such statements.

4        2.  Additional Statements

5        Mr. Homchick contends that Defendants' motion focuses solely on the

6    "trafficking" statements and fails to address statements about other "criminal activity

7    involving force, fraud or coercion, including associating [Mr. Homchick] with . . . sex

8    slavery, kidnapping, rape, criminal sexual abuse, and debt bondage of South Korean

9    women—all of which are provably false statements of fact." (Resp. at 16.)  In doing so,

10   Mr. Homchick cites primarily to his operative complaint—not evidence in the record—

11   and does not specify the statements to which he refers, or even the portion of his

12   operative complaint where those allegations may be found.  (*See generally id.*)

13       Nevertheless, the parties discuss several statements that appear in the record and

14   that reference or relate to some form of "fraud, force, or coercion" or "sex slavery,

15   kidnapping, rape, criminal sexual abuse, [or] debt bondage":

16   • Prosecutor Satterberg:  They euphemistically called themselves hobbyists.
        And their hobby was the criminal sexual abuse of women brought here,
17      against their will, in servitude to pay off debts back in Korea.  (Press Conf.
        Tr. at 19-20.)
18
     • Sheriff Urquhart:  [The prostituted women] were abused and commercially
19      raped by men here in King County.  That's what this case is about.  And
        that's what is fueling us.  Because this is an international human trafficking
20      ring.  It's right here in King County, Washington.  And we're offended by it.
        (*Id.* at 39.)
21
     • Prosecutor Satterberg:  Because they had money, these men gained access to
22      sexually abuse these vulnerable young women, then put their energies toward

ORDER - 21

1
2

a campaign to encourage many more men to do the same.  (Press Release at 2.)

Additionally, Police Chief Mylett made the following statements:

3
4

- Police Chief  Mylett:  [I]n cases such as this, the sexual contact was not consensual, and these women were being forced to perform sexual acts through exploitation, force and coercion.  (Press Conf. Tr. at 16.)

5
6

- Police Chief Mylett:  These women are being abused, they're being raped, they're being murdered.  (*Id.* at 26.)

7

As discussed above, Defendants delineated multiple times the differences between

8

what they alleged the Arrestees did—promoting prostitution through review websites—

9

and what they allege a broader group of individuals did:  forcing women against their will

10

to travel to the United States to engage in prostitution.  *See supra* § III.C.1.  Similarly,

11

the context of the Press Release and Press Conference made clear that none of the

12

Arrestees were accused of kidnapping, murder, or rape, and that they were only charged

13

with promoting prostitution.  *See id.*

14

The parties may disagree on the semantics of what specific activities constitute

15

"sexual abuse," "commercial rape," and "commercial exploitation."  However, to the

16

extent the remaining statements about "hobbyists," "these men," and the Arrestees target

17

Mr. Homchick, they are insufficient to withstand summary judgment on Mr. Homchick's

18

defamation claim because the "sting" of Defendants' statements about Mr. Homchick in

19

the Press Conference and Press Release are true.  *See Mohr*, 108 P.3d at 775 ("A

20

defendant need only show that the statement is substantially true or that the gist of the

21

story, the portion that carries the 'sting,' is true."); *id.* (holding that the court, not the jury,

22

determines the "sting" of a report); *see also Herron*, 776 P.2d at 102 ("Where a report

1    contains a mixture of true and false statements, a false statement (or statements) affects

2    the 'sting' of a report only when 'significantly greater opprobrium' results from the

3    report containing the falsehood than would result from the report without the

4    falsehood.").

5            Among the facts to which Mr. Homchick stipulated are that Mr. Homchick "is a

6    member of an exclusive group of men dedicated to the *commercial sexual exploitation* of

7    women, particularly foreign women brought into the United States for prostitution

8    purposes." (Prosecutor's Statement at 1 (emphasis added).)  Additionally, Mr. Homchick

9    stipulated that his actions promoting prostitution "directly expanded and increased the

10   market for exploited women in the region," that as a result of his actions "numerous

11   Asian brothels have sprung up in the region to respond directly to the demand for

12   prostitution" and that "[t]hese brothels serve as part of a national pipeline that transports

13   exploited women around the country for use in prostitution." (*Id.*)  Mr. Homchick further

14   stipulated that he "maintained constant communication centered on [his] obsession with

15   sexual exploitation" and "contributed to a national network of commercial sexual

16   exploitation and personally engaged in this exploitation time and time again." *Id.*  Mr.

17   Homchick may not relitigate these facts to which he stipulated.  *See Wingate v. City of*

18   *Seattle*, 198 F. Supp. 3d 1221, 1226 (W.D. Wash. 2016) (noting that parties cannot

19   challenge stipulated facts made the during course of their prosecutions); (*see also* 7/6/18

20   Order at 12) (ruling that Mr. Homchick "cannot proceed on any theory that [his guilty]

21   plea was not knowing and voluntary.").)

22   *//*

1    Mr. Homchick claims that he is not proceeding "on any theory that his plea was

2    not knowing or voluntary." (Resp. at 33.) Because Mr. Homchick admitted to

3    contributing "to a national network of commercial sexual exploitation and personally

4    engaged in this exploitation time and time again," Mr. Homchick's defamation claim

5    must rest on fine-tooth distinctions between "sexual exploitation" (to which he admitted)

6    and "sexual abuse," "commercial rape," and "commercial exploitation" (which he

7    contends defamed him). These distinctions are too fine to sustain a defamation claim.

8    Even if those terms were meaningfully different—and it is far from clear that they are—

9    the court concludes that the "sting" of the Press Release and Press Conference, when

10   considered as a whole, is true. *See Mohr*, 108 P.3d at 775. As discussed above,

11   Defendants made clear that the Arrestees—which included Mr. Homchick, although they

12   did not use his name—were charged with promoting prostitution, not more serious crimes

13   such as trafficking, rape, or murder. *See supra* § III.C.1. Defendants' use of these

14   additional terms must be read in that context and cannot be fairly read to allege that Mr.

15   Homchick committed crimes beyond the crime of promoting prostitution that he was

16   charged with and to which he pleaded guilty. *See id.* ("The 'sting' of a report is defined

17   as the gist or substance of a report when considered as a whole.") (quoting *Herron*, 776

18   P.2d at 102).

19   For these reasons, the court concludes that Defendants are entitled to summary

20   judgment on Mr. Homchick's defamation claim.[4]

21

22   [4] In Defendants' reply brief, Defendants move to strike a "report summary" submitted by
     Lauren A. Freeman on behalf of Mr. Homchick on the ground that her interpretations of the

1

**D.     False Light**

2

"False light differs from defamation in that it focuses on compensation for mental

3

suffering, rather than reputation."  *Corey v. Pierce Cty.*, 225 P.3d 367, 373 (Wash. Ct.

4

App. 2010).  Nevertheless, "like defamation, false light claims require a showing of

5

falsity and knowledge of, or reckless disregard for that falsity."  *Id.*  "A false light claim

6

arises when 'someone publicizes a matter that places another in a false light if (a) the

7

false light would be highly offensive to a reasonable person and (b) the actor knew of or

8

recklessly disregarded the falsity of the publication and the false light in which the other

9

would be placed.'"  *Id.* (quoting *Eastwood v. Cascade Broad. Co.*, 722 P.2d 1295, 1297

10

(Wash. 1986)).  "[A] plaintiff must present a prima facie case of false light to overcome a

11

motion for summary judgment."  *Seaquist v. Caldier*, 438 P.3d 606, 616 (Wash. Ct. App.

12

2019) (affirming a summary judgment in favor of the defendant where the plaintiffs

13

failed to present prima facie evidence of falsity).

14

Mr. Homchick rests his false light claim on the same statements made by

15

Defendants at the Press Conference, in the Press Release, and in the Handout.  (*See* Resp.

16

at 30.)  For the same reasons Mr. Homchick fails to show falsity—and that several of the

17

alleged statements were about him in the first place—for his defamation claim, *see supra*

18

19

Washington Rules of Professional Conduct amount to opinions of law that are reserved for the court.  (*See* Reply at 19 (citing 2nd Cassubhai Decl. ¶ 4, Ex. 1 ("Freeman Rpt.").)  Mr.

20

Homchick relies on Ms. Freeman's report primarily to attack Defendants' invocation of the law enforcement privilege.  (*See* Resp. at 28.)  Because the court need not address the law enforcement privilege to dispose of Mr. Homchick's defamation claim, the court denies as moot

21

Defendants' motion to strike Ms. Freeman's report.  For the same reasons, the court denies as moot Mr. Homchick's separately filed motion to supplement the summary judgment record (*see*

22

Mot. to Supplement (Dkt. # 85)) with the expert rebuttal expert report of Bruce A. Green, which is directed at Ms. Freeman's report.

1  § III.C, he fails to show falsity for his false light claim.  Therefore, Defendants are

2  entitled to summary judgment on Mr. Homchick's false light claim.

3  **E.  Aiding and Abetting Defamation and False Light**

4  Mr. Homchick includes two claims in his operative complaint for aiding and

5  abetting allegedly defamatory statements by Police Chief Mylett, who is no longer a

6  defendant in this case, Demand Abolition, and "City of Bellevue Agents."  (*See* SAC

7  ¶¶ 189-93.)  Defendants contend they are entitled to summary judgment on these claims

8  (*see* MSJ at 26-27), and the court agrees.  Mr. Homchick concedes that "there is no

9  specific case" in a Washington court recognizing a cause of action for aiding and abetting

10  defamation or false light but contends that "there is nothing extraordinary about the

11  theory under basic principles of common law."  (Resp. at 31.)  Even if the court were to

12  recognize an aiding and abetting theory for defamation or false light, Mr. Homchick has

13  not met his burden to show that the underlying statements of which he complains are

14  defamatory or placed him in a false light.  Thus, Defendants are entitled to summary

15  judgment on Mr. Homchick's aiding and abetting claims as well.

16  **F.  Intentional Infliction of Emotional Distress**

17  The burden of proof on an intentional infliction of emotional distress ("IIED")

18  claim is stringent. *See Lyons v. U.S. Bank Nat. Ass'n*, 336 P.3d 1142, 1151 (Wash. 2014).

19  To prevail on an IIED claim, "a plaintiff must prove (1) outrageous and extreme conduct

20  by the defendant, (2) the defendant's intentional or reckless disregard of the probability

21  of causing emotional distress, and (3) actual result to the plaintiff of severe emotional

22  //

1  distress." *Steinbock v. Ferry Cty. Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct.

2  App. 2011).

3     "The first element requires proof that the conduct was 'so outrageous in character,

4  and so extreme in degree, as to go beyond all possible bounds of decency, and to be

5  regarded as atrocious, and utterly intolerable in a civilized community.'" *Lyons*, 336

6  P.3d at 1151 (quoting *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Dicomes*

7  *v. State*, 782 P.2d 1002, 1012 (Wash. 1989)).  "The question of whether certain conduct

8  is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to

9  determine if reasonable minds could differ on whether the conduct was sufficiently

10  extreme to result in liability." *Id.* (quoting *Dicomes*, 782 P.2d at 1013).  Similarly, "[i]t is

11  for the court to determine whether on the evidence severe emotional distress can be

12  found; it is for the jury to determine whether, on the evidence, it has in fact

13  existed." *Id.* (quoting Restatement (Second) of Torts § 46 (1965)).

14     Defendants are entitled to summary judgment on Mr. Homchick's IIED claim

15  because reasonable minds could not differ on whether Defendants actions at the Press

16  Conference and in the Press Release went "beyond all possible bounds of decency."

17  *Lyons*, 336 P.3d at 1151.  As discussed above, Defendants announced the initial results of

18  a broad investigation into prostitution and trafficking in the Seattle area, and did not

19  accuse Mr. Homchick of crimes beyond those with which he was charged.  *See supra*

20  § III.C.  Although the topics addressed at the Press Conference and in the Press Release

21  are not for the faint of heart, discussing Defendants' investigation into these activities is

22  hardly outrageous.

## G.   Negligent Infliction of Emotional Distress

Negligent infliction of emotional distress ("NIED") is a narrowly construed tort under which a plaintiff must prove (1) that he or she suffered emotional distress that is within the scope of foreseeable harm of the negligent conduct, (2) the plaintiff reasonably reacted given the circumstances, and (3) objective symptomatology confirms the distress." *Repin v. State*, 392 P.3d 1174, 1184 (Wash. Ct. App. 2017) (citing *Bylsma v. Burger King Corp.*, 293 P.3d 1168, 1170-71 (Wash. 2013)).  "[T]o satisfy the objective symptomology requirement . . . a plaintiff's emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Hegel v. McMahon*, 960 P.2d 424, 431 (Wash. 1998).  The plaintiff must provide "objective evidence regarding the severity of the distress, and the causal link between the observation at the scene and the subsequent emotional reaction." *Id.*

Defendants contend that they owed no relevant duty of care to Mr. Homchick, and that Mr. Homchick fails to provide evidence of any medical diagnosis that supports the objective symptomology element.  Mr. Homchick's response does not refute these arguments and does not point to medical evidence of objective symptomology.  (*See generally* Resp.)  Accordingly, Defendants are entitled to summary judgment on Mr. Homchick's NIED claim.

## H.   Claims Under 42 U.S.C. § 1983

Mr. Homchick brings two claims against Defendants under 42 U.S.C. § 1983, one for Fourteenth Amendment due process violations (SAC ¶¶ 149-58) and one for "abuse

*//*

1    of process" (*id.* ¶¶ 159-68).  Defendants move for summary judgment on both claims.

2    (*See* MSJ at 12-25.)

3         Section 1983 provides a private right of action against government officials for a

4    deprivation "of any rights, privileges, or immunities secured by the Constitution and

5    laws."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the

6    badge of their authority to deprive individuals of their federally guaranteed rights and to

7    provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161

8    (1992).  Section 1983 is not itself a source of substantive rights.  *Graham v. Connor*, 490

9    U.S. 386, 393-94 (1989).  Rather, it provides a cause of action for the vindication of

10   federal rights.  *Id.*  "[S]ection 1983 'imposes liability for violations of rights protected by

11   the Constitution, not for violations of duties of care arising out of tort law.'"  *Johnson v.*

12   *Barker*, 799 F.2d 1396, 1399 (9th Cir. 1986) (quoting *Baker v. McCollan*, 443 U.S. 137,

13   146 (1979)).  "The Fourteenth Amendment is not a 'font of tort law to be superimposed

14   upon whatever systems may already be administered by the States.'"  *Id.*  (quoting *Paul*

15   *v. Davis*, 424 U.S. 693, 701 (1976)).  "In order to achieve constitutional import, there

16   must be a deprivation of a protected interest."  *Id.*

17        1.   Due Process Claim

18        The Fourteenth Amendment's guarantee of due process applies when a

19   constitutionally protected liberty or property interest is at stake.  *Vanelli v. Reynolds Sch.*

20   *Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982).  An analysis of a due process claim

21   requires the court to ask "(1) Was the plaintiff deprived of a protected interest; and (2) if

22   //

1    so, what process was due?" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422 (1982); *see*

2    *also Mishler v. Nev. State Bd. of Med. Examiners*, 896 F.2d 408, 409 (9th Cir. 1990).

3    Defendants discuss Mr. Homchick's defamation allegations as part and parcel of his

4    § 1983 claim for due process violations.  (*See, e.g.*, MSJ at 12-13 ("[Mr.] Homchick's

5    due process theory under [§] 1983 revolves around defamation. . . . To establish a claim

6    for defamation under § 1983, [Mr.] Homchick must first establish defamation under state

7    law.").)  In response, Mr. Homchick states that he "is not seeking to federalize his

8    common law defamation claim and, thus, no response to the defamation-plus line of

9    argument is necessary."  (Resp. at 34 n.9.)  However, Mr. Homchick does not identify

10   any other basis for his due process claim.  (*See id.* at 33 (stating that Mr. Homchick "does

11   not accept" that "King County can conflate the prostitution crime for which he pled out

12   with accusations of sex trafficking, sex slavery, rape, kidnaping, criminal sexual abuse,

13   and other conduct involving force or coercion").)  The most charitable view of Mr.

14   Homchick's due process claim is that it relates to either vague allegations of impropriety

15   with respect to his state court prosecution (which he is barred from challenging under

16   *Heck*), or with respect to King County's relationship with Demand Abolition.  In either

17   case, however, Mr. Homchick fails to identify the liberty or property right that he alleges

18   Defendants violated.  (*See generally* Resp.)

19          This is not the first time Mr. Homchick has failed to identify the theory behind his

20   § 1983 due process claim.  In denying Defendants' earlier motion to dismiss Mr.

21   Homchick's federal claims, the court noted that Mr. Homchick "does not concretely

22   identify how Defendants violated his right to due process."  (7/6/18 Order at 11.)

1   Although the court did not dismiss Mr. Homchick's federal claims based on *Heck*, the

2   court held that Mr. Homchick "cannot proceed on any theory that [his guilty] plea was

3   not knowing and voluntary." (*Id.* at 12.)  Now, at the summary judgment stage, Mr.

4   Homchick's failure to identify a protected liberty or property interest is fatal to his due

5   process claim.[5]

6          2.   Abuse of Process Claim

7          In the first instance, the court notes that the Ninth Circuit has never held that an

8   abuse of process claim is cognizable under § 1983.  *See West v. City of Mesa*, 708 F.

9   App'x 288, 292 (9th Cir. 2017) (concluding that "[e]ven assuming an abuse of process

10  claim is cognizable under § 1983 in our circuit, [the plaintiff] failed to plead sufficient

11  facts to establish the elements of such a claim").  Indeed, "[m]ost federal courts to

12  consider whether a state actor's alleged abuse of process can give rise to a constitutional

13  claim under § 1983 have concluded that there is no constitutional violation absent

14  conscience-shocking egregious wrongdoing."  *Brown v. Lever*, No.

15  //

16          [5] Mr. Homchick requests that the court "allow him to complete discovery that could
17  inform the Court's review of whether the conduct at issue arises to conscience-shocking." (Resp.
    at 33.)  Mr. Homchick also includes, in a standalone paragraph, a request for a "continuance" on
18  the grounds that "additional discovery may be helpful before determination of at least the federal
    claims." (*Id.* at 34.)  "If a nonmovant shows by affidavit or declaration that, for specified
19  reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer
    considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take
20  discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Mr. Homchick's
    counsel contends that more discovery is necessary to determine whether Defendants' actions
    with respect to their relationship with Demand Abolition "shock the conscience."  (*See*
21  1st Cassubhai Decl. ¶ 3.)  However, Mr. Homchick fails to identify what facts he hopes to
    uncover with this additional discovery and fails to explain what liberty or property interest of Mr.
22  Homchick's is at stake, as is necessary to sustain a due process claim.  Therefore, the court
    DENIES Mr. Homchick's request for a Rule 56(d) continuance.

1   2:17-cv-00828-JAD-PAL, 2018 WL 1903120, at *6 (D. Nev. Apr. 20, 2018) (citing

2   Martin A. Schwartz, Section 1983 Claims & Defenses, § 3.18 Malicious Prosecution;

3   Abuse of Civil Process (4th ed. 2018 Supp.) (collecting cases)).

4   　　　Even if the court were to recognize an abuse of process claim under § 1983, Mr.

5   Homchick's claim fails for a similar reason as his due process claim, namely that he does

6   not identify the process that was abused.  At best, Mr. Homchick contends that an abuse

7   of process claim arises in the presence of "conscience-shocking conduct," and argues that

8   King County's relationship with Demand Abolition somehow amounts to such conduct.

9   However, Mr. Homchick cites no authority for the proposition that a county receiving

10  funding from an advocacy organization aligned with the county's priorities constitutes an

11  abuse of process.[6]  Accordingly, Defendants are entitled to summary judgment on Mr.

12  Homchick's abuse of process claim.

13  　　　3.  _Monell_ Claim Against Defendant King County

14  　　　In addition to the individual Defendants, Mr. Homchick alleges his § 1983 claims

15  against Defendant King County on the basis that King County "failed to train and/or

16  supervise its employees with deliberate indifference" to Mr. Homchick's rights.  (SAC

17  ¶¶ 155, 166.)  Under the _Monell_ doctrine, "a municipality cannot be held liable under

18  § 1983 on a respondeat superior theory."  _Monell v. New York City Dep't of Soc. Servs._,

19  //

20

21  [6] Mr. Homchick's failure to identify a protected liberty or property interest or an abuse of process also entitles Defendants to qualified immunity.  _See Pearson v. Callahan_, 555 U.S. 223, 232 (2009) (explaining that government officials are entitled to qualified immunity if the plaintiff fails to point to facts that support a violation of a clearly established constitutional right) (discussing _Saucier v. Katz_, 533 U.S. 194, 201 (2001)).

22

1    436 U.S. 658, 691 (1978).  "Instead, a plaintiff can allege that the action inflicting injury

2    flowed from either an explicitly adopted or a tacitly authorized city policy."  *Vinatieri v.*

3    *Mosley*, 787 F. Supp. 2d 1022, 1034-35 (N.D. Cal. 2011) (citing *Monell*, 436 U.S. at

4    690-91); *Harris v. City of Roseburg*, 664 F.2d 1121, 1130 (9th Cir. 1981) ("Official

5    policy within the meaning of *Monell* [encompasses situations] where a municipality

6    impliedly or tacitly authorized, approved, or encouraged illegal conduct by its police

7    officers.") (internal quotations and citations omitted) (alterations in *Harris*)).  "[B]ecuase

8    *Monell* held that a municipality may not be held liable under a theory of respondeat

9    superior, a plaintiff must show that the municipality's deliberate indifference led to the

10   omission and it caused the employed to commit the constitutional violation."  *Vinatieri*,

11   787 F. Supp. 2d at 1035 (citing *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th

12   Cir. 2002)).  "In order to do so, the plaintiff must also show that the municipality was on

13   actual or constructive notice that its omission would likely result in a constitutional

14   violation."  *Id.* (citing *Gibson*, 290 F.3d 1175 at 1186; *Farmer v. Brennan*, 511 U.S. 825,

15   841 (1994)).

16          Taken together, to survive summary judgment on his *Monell* claim, Mr. Homchick

17   must show "(1) that an officer employed by [King County] violated [Mr. Homchick's]

18   rights; (2) that [King County] has customs or policies that amount to deliberate

19   indifference . . .; and (3) that these policies were the moving force behind the officer's

20   violation of [Mr. Homchick's] constitutional rights, in the sense that [King County]

21   would have prevented the violation with an appropriate policy."  *See id.* at 1035

22   (citing *Gibson*, 290 F.3d 1175 at 1186; *Amos v. City of Page*, 257 F.3d 1086, 1094 (9th

Cir. 2001)).  A *Monell* claim must be based on "a deliberate choice to follow a course of

action . . . made from among various alternatives by the official or officials responsible

for establishing final policy with respect to the subject matter in question."  *See Gillette v.

Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992); *see also id.* ("The cases make clear that

the unconstitutional discretionary actions of municipal employees generally are not

chargeable to the municipality under section 1983.").

Defendants contend they are entitled to summary judgment on Mr. Homchick's

§ 1983 claim against King County because Mr. Homchick fails to demonstrate a basis for

*Monell* liability.  (MSJ at 20.)  Mr. Homchick spends only two paragraphs in his

responsive brief on his *Monell* claim and fails to identify (1) any constitutional violation

or (2) any King County policy that was the "moving force" behind such a violation.  (*See*

Resp. at 32.)  Mr. Homchick's only substantive argument is that "the resolution of [Mr.

Homchick's] claim against King County under *Monell* flows in large part from

Defendants' broad admissions concerning their ideological and policy-based views

conflating prostitution and trafficking."  (*Id.*)  In making this argument, Mr. Homchick

fails to cite any evidence in the record and fails to cite legal authority for the proposition

that Defendants' "ideological and policy-based views" rise to the level of a constitutional

violation against Mr. Homchick.  Accordingly, Defendant King County is entitled to

summary judgment on Mr. Homchick's *Monell* claim.

//

//

//

1

### IV.   CONCLUSION

2          For the foregoing reasons, the court GRANTS Defendants' motion for summary

3   judgment (Dkt. # 61) and DENIES AS MOOT Defendants' motion to supplement the

4   summary judgment record (Dkt. # 85).

5          Dated this 21st day of August, 2020.

6

7   _____

8   JAMES L. ROBART
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22